{¶ 48} I respectfully disagree with the majority. The following pertinent facts, which were presented at the administrative hearing, define the tenor of the "investigation" and were not included in the majority opinion. First, in the midst of Chief Jimison's investigation of the key incident, after Officer Mitchell was called at home and asked about the incident and denied involvement, he was then called in for a face-to-face meeting and again asked about his involvement, which he denied.
 {¶ 49} Simultaneously, at the direction of Chief Jimison, Detective Kelley and Lieutenant Bokovitz went to John Carroll University, where Mitchell had previously worked as a campus police officer, to inquire about Mitchell's conduct. They spoke to George Alaimo who was currently employed as the Information Officer with John Carroll University, but had worked with Mitchell as his superior officer in the campus police department. Alaimo spoke favorably of Mitchell and had no negative information to disclose regarding Mitchell's conduct while he was on the force. There was no evidence presented to indicate that this type of in-depth investigation was performed on any of the other suspects at this early point in the investigation, prior to the polygraph examinations.
 {¶ 50} The internal investigation conducted by the police department prior to charges being issued against Mitchell reveals very little evidence in support of said charges. Notably absent was any eyewitness testimony placing Mitchell at the detective's desk or near the lieutenant's office where the key was kept or any fingerprint or other forensic evidence placing Mitchell at the scene. Moreover, there was no possible motive established as to why Mitchell would want to obtain materials from the desk, or even if he was aware what the contents of the drawer were.
 {¶ 51} The majority lends great credence to a brief conversation Mitchell had with Officer Weiner at Detective Weir's desk approximately one week prior to the key incident. The majority also ties this into Officer Weiner seeing Mitchell in the hall outside of Detective Weir's office, presumably as evidence that Mitchell was somehow attempting to gain access to the key and subsequently the drawer. However, testimony at the trustee hearing reveals that the key was in plain view and clearly marked with a tag reading "Detective's Desk Key." There was also testimony that Detective Weir's desk was frequently used by the officers as a place to write reports or use the telephone. Thus, Mitchell's behavior did not fall outside of normal activity at the station.
 {¶ 52} Officer Mitchell did admit that he had tape recorded Officer Silvis in the past regarding a previous incident but did not admit that on initial questioning, as he subsequently discarded the tape. Moreover, there was testimony from other officers that they had tape recorded conversations with other officers in the past. Thus, tape recording between officers was not an uncommon practice. Also, during Mitchell's meeting with Chief Jimison and Lt. Bokovitz, Mitchell was asked if he was tape recording the conversation. When he answered in the affirmative, he was not asked to turn off the recorder but, rather, to merely place it on the table to allow for better reception, evidence that tape recording conversations between officers was not impermissible.
 {¶ 53} Perhaps the most troubling issue summarily dismissed by the majority, as well as the trial court, is the issue of Mitchell's union organizing activity. It is important to note that a union organizing effort was underway with Local 67 of the Fraternal Order of Police ("FOP"). Mitchell testified that he initiated contact with the union sometime in January 2001. He also noted that there was a general atmosphere of displeasure among the officers regarding the department's promotion practices. Mitchell also stated that he had held a union organizing meeting at his home with approximately ten officers present. Mitchell could not say whether Chief Jimison was aware of his organizing activities but acknowledged that it was a small department where it was just a "matter of time" before the chief and lieutenant found out about the union effort. There was also testimony that a union organizing effort had been attempted in the mid 1980s and that Chief Jimison conducted a vigorous anti-union campaign.
 {¶ 54} In its judgment entry, the trial court concluded Mitchell's appeals were "not well taken" and that Mitchell had been "properly removed for dishonesty and insubordination pursuant to Bainbridge Township Policy Manual Rules 8.1 and 8.3, and otherwise." The trial court also noted, "[a]ppellant's prior good service record is irrelevant. Defendant's claim of retaliation is both irrelevant to the Appellee's decision of April 8, 2002 and beyond the jurisdiction of the Appellee and this Court."
 {¶ 55} The majority notes that the issue of union involvement is "irrelevant." A trial court is authorized to review the decision of the board of trustees pursuant to R.C. 2506.04. The trial court considers the whole record and determines whether the administrative order is "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence."[1]
 {¶ 56} Thus, as the trial court is charged with considering the whole record, its determination that it lacks jurisdiction to consider Mitchell's past performance and claim of retaliation are wholly inaccurate. The theory that Mitchell's discharge for insubordination was pretextual and that his termination may have been retaliatory in nature goes to the heart of the issue of whether he was wrongfully terminated. Therefore, the trial court had to make a finding in that regard and not summarily dismiss that claim. Although the standard of review by this appellate court is more limited in scope, I believe the trial court abused its discretion in refusing to address the retaliation claim advanced by Mitchell, as it serves to demonstrate that the termination may have been unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence.
 {¶ 57} The majority also concludes that the charges against Mitchell "were not specifically set forth in the Disciplinary Policy" and, thus, the board had the right to fashion the appropriate discipline. I respectfully disagree. In the instant case, Bainbridge Township developed and adopted formal disciplinary rules, which delineate specific procedures through which township employees, including police officers, would be disciplined for infractions. Employee handbooks, presented to employees for review upon hire, are enumerated rights which can be enforceable against employers if breached.[2] Moreover, although police officers are provided statutory protections, additional departmental rules may reach further, and provide additional rights and protective measures, as long as they are not in conflict with statutory protections.[3]
 {¶ 58} The Bainbridge Township Disciplinary Rules, submitted as part of the record, provide, "[t]he [Township] and supervisors of the department should follow an established system of progressive discipline when correcting job behavior." "Lying in an official investigation," is expressly categorized as a Group I offense, subject to a four to fifteen-day suspension without pay, according to the rules. "Insubordination" is categorized as a Group II offense, warranting a penalty of "instruction and cautioning."
 {¶ 59} Thus, the trial court's finding that Mitchell was dishonest and insubordinate, were subject only to a maximum of a short-term suspension pursuant to the township's disciplinary rules, and not termination, as the majority asserts.
 {¶ 60} Therefore, based on the foregoing, the trial court abused its discretion in concluding that Mitchell was properly terminated for dishonesty and insubordination and that it was without jurisdiction to hear Mitchell's retaliation claim. Accordingly, I must dissent.
[1] R.C. 2506.04.
[2] Tersigni v. Gen. Tire, Inc. (1993), 91 Ohio App.3d 757.
[3] State ex rel. Hipp v. N. Canton (1996),75 Ohio St.3d 221, 224.